CASANUEVA, Chief Judge,
Specially concurring.
I fully concur with the majority opinion. I write to discuss some of the unique factual occurrences that the record demonstrates took place and how those instances may impact the issue of a likelihood of irreparable harm.

The Paper

A.K.’s criminology course required her to author a term paper that complied with the academic integrity standards of the University of Tampa. A.K. chose to write on the Posse Comitatus Act. In the paper she advocated the Act’s abolishment — a position that appears to strongly conflict with her professor’s personal opinion. Her effort yielded a grade of “F” due to her professor’s conclusion that her work was rife with plagiarism. To further emphasize his displeasure with A.K.’s paper, Professor LaRose exercised his discretion to grade her work for the entire course with an “F.” Candidly, were I asked to grade the term paper (it is a part of the record on appeal), I would conclude that it was unsatisfactory work product for an upper-level college student which might receive a grade of “F” based upon its merits alone. However, the issue is not the quality of A.K.’s writing but whether the paper contains plagiarized material.

The Definition

The University of Tampa defines the term “plagiarism” as “[p]resenting words *267 or ideas of another person as your own. The most common form of this is copying a direct quotation from a source and not crediting the author.” Logic suggests that to present the words or ideas of another person as your own requires some degree of intent. It is undisputed that the University’s position is that intent to plagiarize is unnecessary.

An Example

A paragraph from A.K.’s paper illustrates, in part, the issue of contextual plagiarism. She began a paragraph by writing: “The Posse Comitatus Act is archaic and hamstrings effective use of federal assets in the War on Terror, illegal immigration and narcotics.” One sentence later she writes: “The act has its loopholes for exceptions, ‘except in such cases and under such circumstances as such employment of said force may be expressly authorized by the Constitution or by Act of Congress.’ ”
Despite the second passage’s use of quotation marks, the professor concluded that the passage constitutes plagiarism. A reasonable reader of the paragraph would conclude that her quoted passage came directly from the Act. The clear lack of proper citation was the basis for the professor’s and the University’s conclusion that A.K. committed plagiarism. The result was a failing grade for the paper and for the course.
An overbroad reading of the University’s definition of plagiarism, coupled with the University’s position that intent to plagiarize is not required to constitute a violation of the academic code, arguably results in almost unlimited discretion afforded to faculty to determine whether a student plagiarized a paper. That same unfettered discretion applies to the process followed by the University’s Academic Integrity Hearing Board when a student challenges a professor’s conclusion.
The hearing board upheld the professor’s charge that A.K. had committed plagiarism but also concluded that she had no intent to do so. However, that concession is of little benefit to A.K. Neither this conclusion nor the University’s definition of plagiarism will appear on A.K.’s transcript. It is this transcript which will be reviewed by postgraduate and professional schools to which A.K. may apply.

Institutional Concerns

Several procedural issues plagued the proceedings between A.K. and the University. Following the Academic Integrity Hearing Board’s decision upholding the professor’s finding of plagiarism, A.K. sought an appeal she believed was authorized by the University’s rules. The University informed A.K. that the hearing board’s decision was final and nonap-pealable, a position it maintained throughout most of the proceedings in the circuit court below. A.K. disagreed, citing a version of the University’s Student Handbook. Eventually the trial court determined that the University’s position was incorrect — an appeal from the hearing board was authorized and permitted.
Another interesting procedural glitch occurred in the process of convening the Academic Integrity Hearing. The University’s rules provided that A.K. could attend the hearing with a member of the University community. Over a week in advance of the hearing, A.K. advised the University that she would bring her university community mentor, a University of Tampa alumnus. On the date of the hearing, a University administrator informed A.K. that her mentor was barred from attending the hearing because the University did not consider alumni to be members of the University community.
There are other snippets contained in the record of this proceeding that suggest a University review might be well-advised. *268 If credible, some testimony suggests that the professor had an antagonistic relationship with A.K. and that he belittled her position before other students. It is, of course, the University’s matter to determine whether the professor’s alleged actions were professional behavior. However, such actions convey a message to all students suggesting what might happen if one were to advance an idea or thought with which the professor disagrees.
Finally, the record suggests that another student committed similar citation errors in his paper as A.K. committed in hers. Professor LaRose graded his paper with a “C” and made no accusation of plagiarism, while A.K. received the substantial punishments already described. If this reference is accurate, the academic treatment of the two students appears to be disparate.
The parties seem to have embarked upon a “battle royale,” with no sign of either side willing to consider a diplomatic solution. One wonders if, after the battlefield falls silent and a victor has been declared, there will be any spoils of the war left to enjoy.